# JOHN G. JOHNSON v. WILD RICE BOOM COMPANY.[1]

December 18, 1914.

Nos. 18,670—(35).

**Harmless error.**

1. The refusal to require plaintiff to elect between different causes of action which in fact were tried as one, even if error, was without prejudice to defendant.

**New trial — error in charge — two causes tried as one.**

2. The cause of action for diverting more water than agreed from the navigable stream by which plaintiff operated his flour mill, and the one for detaining waters unreasonably, by flooding dams at the source of the same stream, being tried as one cause, the verdict rendered may include damages for both causes, hence error in an instruction relating to one of the causes of action necessarily requires a new trial.

**Case followed.**

3. The same error which inhered in the charge in the case of Heiberg v. Wild Rice Boom Co. supra, page 8, exists here, with reference to the rights of defendant to temporarily detain water in the flooding dams.

**Use of water for driving logs.**

4. The defendant had the right to accumulate and detain water by flooding dams for such time and in such quantities as was reasonably necessary to enable it to drive with reasonable efficiency and dispatch the logs which were to be floated by it upon that part of the stream over which it operated, and this notwithstanding that such detention of the water so lessened the supply in the stream that plaintiff meanwhile was unable to run his mill.

**Charge to jury.**

5. The injury to the mill dam is not so clearly shown to have resulted wholly from diversion of the water, that the error in the charge, in respect to the right to accumulate and detain the quantity of water needed by defendant, was without prejudice.

[1] Reported in 150 N. W. 218.

Note.—As to the right of a riparian owner to impound water for the purpose of floating logs, see note in 35 L.R.A.(N.S.) 832.

The question of the correlative rights of log owners and riparian owners is discussed in notes in 41 L.R.A. 377 and 32 L.R.A.(N.S.) 376.

Action in the district court for Norman county upon four causes
of action to recover $10,000, damages caused by the wrongful diver-
sion of water from plaintiff's mill.   The answer alleged defendant's
incorporation under sections 2933 and 2934, R. L. 1905; that its
principal business consisted in driving and handling logs and timber
from the upper tributaries of Wild Rice river; that prior thereto no
other corporation organized under that law had taken possession of
the river or its tributaries for the purpose of handling or driving
logs therein, and that defendant had ever since maintained its dams
and works in carrying on the driving, handling and transportation
of logs and timber through the river; that the maintenance and
operation of the dams and the flooding dams were necessary to enable
it to drive, handle and transport logs on said waters and that the
dams had been maintained and operated for that purpose and no
other.   The case was tried before Grindeland, J., and a jury which
returned a verdict for $2,000 on the first, second and third causes
of action and a verdict for $800 on the fourth cause of action.   From
an order denying defendant's motion for a new trial, it appealed.
Reversed.

*Lind, Ueland & Jerome,* for appellant.

*Peter Sharpe* and *Christian G. Dosland,* for respondent.

HOLT, J.

Damages were claimed because defendant's interruption of the
natural flow of water in Wild Rice river and diversion of part of
such water prevented plaintiff from operating his flour mill, and
also for injury to the mill dam.   The jury awarded plaintiff $2,000
for the loss sustained from inability to run the mill because of de-
fendant's interference with the water, and $800 for injury to the
dam.   Defendant appeals from the order denying a new trial.

The Wild Rice river has its source in the westerly part of Clear-
water county and runs in a westerly direction through Mahnomen
and Norman counties to the Red River of the North.   It is the out-
let for several large lakes near its source, and along its course streams
and tributaries empty into it.   The channel is tortuous, exceeding 200
miles in length.   It is a navigable stream, at least for the transporta-

'tion of logs and timber products. The village of Ada is a short distance north of the river, and on Long lake, near the village, is a saw mill owned and operated by the Wild Rice Lumber Co. The lumber company since prior to 1904 brought the logs and timber cut near the head waters of Wild Rice river to its mill pond in Long lake by floating them down the river to a point near Ada, where are its booms. There by means of an 8-foot sluiceway, cut through the north bank of the river, and an artificial channel into Long lake the logs are brought from the river to its saw mill. The lumber company had improved the river, and, in 1908, when defendant was incorporated under section 6263, G. S. 1913, as a public service corporation, it took possession of the river for the purpose of handling and driving logs therein, and acquired the improvements and facilities which the lumber company had constructed. Since the last named date defendant has annually transported several million feet of logs on the river down to the lumber company's saw mill. It appears that to drive the logs it usually is necessary to impound the waters in the lakes near the source of the river so as to obtain a head of water sufficient to carry the logs down to the booms. In dry seasons it may be necessary to dam up the water for successive intervals before the drive reaches the booms. Considerable quantities of water are used in flushing or floating the logs from the boom through the sluiceway and channel mentioned into Long lake. The water thus going into Long lake is not returned to the Wild Rice river, but passes into another stream which empties into Red river direct. Many years before the lumber company began to drive logs and operate its mill, plaintiff owned and operated a flour mill on Wild Rice river at a place more than 50 miles by the river below defendant's sluiceway and artificial channel. He obtained power by maintaining an 8-foot dam across the river. Shortly before 1904 he instituted a suit to enjoin the lumber company from diverting any of the waters from the river into Long lake, but before the trial the action was dismissed pursuant to a stipulation which contained an agreement that in the future no more water should be diverted but what sufficient remained to enable plaintiff to operate his flour mill. Johnson v. Wild Rice Boom Co. 118 Minn. 24, 136 N. W. 262, was for violation of this agreement,

and a recovery was sustained. So also was the case of Johnson v. Wild Rice Boom Co. 123 Minn. 523, 143 N. W. 111, for a subsequent period and up to August 1, 1911. In neither of these actions were damages claimed for interrupting the flow of the water by the detention or flooding dams at the outlet of the lakes near the source of the river. However, in Heiberg v. Wild Rice Boom Co. supra, page 8, 148 N. W. 517, and in Juhl v. Wild Rice Boom Co. infra, page 537, 148 N. W. 520, the maintenance and operation of these detention dams constituted the basis for the damages claimed, and the rule of law there announced applies to this case, insofar as damages are based upon the temporary withholding of the water by the dams mentioned. The diversion of part of the waters of the river into Long lake did not cause any damage to the plaintiff mill owners in the last-named cases, because their mills were situated above the sluiceway. In the present case plaintiff set forth four causes of action. The first for wrongfully diverting too much water into Long lake; the second for detaining the waters at intervals by the dams near the source of the river, being the same dams involved in the Heiberg and Juhl cases; the third was for both diversion and detention, virtually joining the first and second causes of action; and the fourth was for damages from the combined wrongs causing the ice to sink and injure the mill dam.

The appeal presents for review the ruling of the court upon defendant's motion to require plaintiff to elect between the first two and the third causes of action; also the charge in respect to the rights of the parties in the stream.

The court refused to require plaintiff to make an election. Although there appears to be no good reason for stating the facts upon which damages are asked for inability to operate the flour mill, because of defendant's interference with the natural flow of the river under three causes of action, we would not grant a new trial for refusing to require an election. It is not perceived how defendant was prejudiced by the ruling. We may say that the better practice would be to eliminate either the first two or the third. No effort was made to prove damages in each cause of action separately, and in the na-

ture of things this could not be done, especially to separate that claimed in the third from either of the other two causes.

The decision in the Heiberg case, supra, is controlling here, so far at least as to require a new trial in respect to the first three causes of action, if the challenged instructions to the jury are substantially alike. For if any damages other than from diversion were allowed they are included in the $2,000 awarded. One sentence, found in the charge in the Heiberg case, namely: "The defendant has no rights which are paramount to those of the plaintiff," is omitted here. This sentence was but a summary of the tenor of the whole charge, to the effect that the rights of plaintiff and defendant to use the waters in the stream were equal. The charge in the instant case is open to the same criticism, namely, the relative rights of the parties to the use of the waters, of vital importance to a correct determination of the case, were not defined. Nowhere is the jury told that in taking possession of the river and tributaries and improving the same to facilitate the handling and floating of logs, and in the handling and floating of logs for the public the defendant was, as aptly stated by the Chief Justice in the Heiberg case, in the exercise of "a power and right not possessed by riparian owners or other persons. The power and authority so granted, being for a public purpose and in aid of navigation, is superior and paramount to the rights of riparian owners." This doctrine is fully and sufficiently discussed, and the authorities supporting it cited in the decision mentioned, and need not be here repeated.

We are also of opinion that defendant was entitled to have more specific instructions given the jury for guidance in determining when its use of the waters of the stream became wrongful as against plaintiff. The defendant's right to use the waters for transportation purposes being superior to that of the riparian owners for power purposes, the proper use must be measured by what is reasonably required to transport with ordinary diligence and by customary methods the property intrusted to it for transportation. On this subject the court refused to give this instruction requested by the defendant: "Defendant had the right to accumulate and retain water by the flooding dams referred to in the complaint for such length of time

and in such quantities as was reasonably necessary to enable it to drive with reasonable efficiency and dispatch the logs which were to be floated from Lower Rice lake to Ada, and this notwithstanding that such accumulation and retention of the water may have impaired the supply of water for plaintiff's mill to such an extent that it could not be operated by water while the water was so accumulated and retained." We deem this instruction to be accurate and appropriate, with perhaps the substitution of "defendant's boom in Wild Rice river near Ada" in place of "Ada." The substance should have been given.

Plaintiff places unwarranted reliance on Crookston Waterworks, Power & Light Co. v. Sprague, 91 Minn. 461, 98 N. W. 347, 99 N. W. 420, 64 L.R.A. 977, 103 Am. St. 525, wherein it is stated that it was intended by the then existing sections 2385 and 2386 of the General Statutes of 1894 "to recognize the rights of the riparian owner in the construction of the dam, and the public in the use of the stream, and that neither one is granted a paramount right." It is evident that reference is had to the right possessed by both the riparian owner and the one floating logs to make use of the stream, each for a legitimate purpose of his own, but neither to make a negligent use thereof to the injury of the other. A corporation which is authorized to improve streams so as to facilitate the driving of logs, and to handle and drive logs for the public, is also given the right to construct flooding dams to detain the water necessary to float the logs it is required to handle. This right was not involved in the case last mentioned, but simply an alleged injury to a power dam through the negligence of one who was using the stream to thereon float his own logs. The decision of Red River Roller Mills v. Wright, 30 Minn. 249, 15 N. W. 167, which the trial court closely followed in framing its charge to the jury, related entirely to the alleged wrongful use which an upper riparian owner made of the stream to the injury of a lower. Page v. Mille Lacs Lumber Co. 53 Minn. 492, 55 N. W. 608, 1119, was between two parties who both used the stream to float their logs. In none of these cases did the question arise whether a corporation like defendant may temporarily detain and accumulate water in flooding dams when reasonably nec-

essary to carry on its work, although it prevents a lower riparian owner, for the time being, from using the stream for power purposes. Such corporation, having the superior right to the use of the water for the public purpose for which it was created, cannot be held liable for impairing the use of power dams, unless it be proven that there has been more of a detention or accumulation than was reasonably necessary for the driving, in a proper manner, of the logs which it was required to drive. It is only for the needless or negligent interference that damages may be claimed. A use. of the waters may not be held needless or negligent, so long as it is required in order to properly do the work defendant is authorized and intrusted by law to do. To illustrate: Suppose defendant had been driving logs to a point below plaintiff's mill through a sluiceway in the dam, and the water supply in the river were such that logs could not be sluiced and the mill operated at the same time. In such a situation defendant would have the superior right to open, and keep open, the sluiceway for the passage of the logs, and plaintiff could not complain. But if defendant in sluicing its logs negligently injured plaintiff's dam, or kept the sluice gates open when there were no logs to float through, or in an unworkmanlike manner negligently protracted the passing of the drive through the sluiceway, an actionable injury would arise.

We suggested above that the instruction requested by defendant was technically faulty in that the terminus of defendant's right to use the waters was stated to be Ada instead of the booms at the sluiceway near Ada. The present action was tried, and so were the prior ones between these parties, upon the theory, as we understand it, that both parties consider their rights as to diversion of water into Long lake governed by the stipulation made when, in 1904, the injunction suit against defendant's predecessor in interest was dismissed.

In respect to the injury to the mill dam the court instructed the jury: "If you should find that during the winter of 1911 and 1912 the defendant diverted water from the river through its sluiceway in violation of the contract, and also find that defendant wrongfully and unreasonably retained the water by dams, then you will proceed to determine whether this caused the damage to plaintiff's dam.

*   *   *   Was the damage to the dam caused by the unlawful diversion of the water, or was it caused by the unreasonable retention of the water, or was it caused by both? If it was caused by either or both, the defendant would be liable." Defendant's exception to the instructions appears well taken, unless it may be said that it conclusively appears that the injury was caused solely by the wrongful diversion of water to Long lake, so that no prejudice resulted from a failure to define the relative rights of the parties in respect to the detention of waters in Wild Rice river. Plaintiff claimed that during the last days of December, 1911, when ice had formed on his mill pond to considerable thickness, defendant detained and diverted the water so that not enough came down to support the ice and it, sinking in the middle of the pond, pressed against the dam, causing a crack in the concrete wall thereof and breaking or displacing some of the piling. He strenuously insists that there is nothing to contradict the testimony of Mr. Sharpe that he, as agent for plaintiff, made an arrangement with defendant's manager that defendant could turn water from the river into Long lake during the last few days of December, 1911, provided it was not done in such quantity as to impair the stability of the ice on the mill pond. There is also testimony that the sluiceway was open, or had a hole in it at that time. It is true that there is no direct testimony contradicting this alleged arrangement. However, there is evidence from which the jury would be warranted in drawing the conclusion that the ice fell not alone from the water diverted, but because at that time a head of water was being accumulated at the flooding dams mentioned. There was also testimony from which the jury could find that a reasonable use by defendant permitted, or required, an accumulation of water in the flooding dams during the winter months, in order to obtain a sufficient supply for floating the logs in the spring. Admissions made by plaintiff in the summer of 1912 were also of a nature to make the cause and extent of the damage to the dam a close question of fact. The evidence is far from satisfactory that any considerable quantity of water was diverted into Long lake during the last days of December, 1911, and the first part of January, 1912. We may also take cognizance of the fact that, in the more than 50-mile course of the

127 M.—32.

river between the sluiceway and plaintiff's dam, no doubt, tributary creeks and rivulets furnish a considerable flow of water to replenish the waters supporting the ice in his mill pond. If it failed to do this the inference is that the dam must have been exceedingly leaky and out of repair before the alleged wrongful acts of defendant took place. Under this situation we are not able to say that the error in the charge on this phase of the controversy was without prejudice.

Order reversed.